# Staunton

POCAHONTAS FUEL COMPANY, INCORPORATED, ET AL. V.
REBECCA W. DILLION, ET AL.

September 21, 1933.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory
and Browning, JJ.

The opinion states the case.

*Greever & Gillespie* and *A. W. Reynolds*, for the appellants.

*R. O. Crockett* and *S. M. B. Coulling*, for the appellees.

HUDGINS, J., delivered the opinion of the court.

The object of this suit, instituted by the heirs of William A. Dillion, who in 1905 died intestate, is to have certain deeds and a lease declared void and of no effect in so far as they affect the title of complainants to an undivided one-half interest in two certain tracts of land.

Complainants allege and prove that on the 27th day of

February, 1869, George F. Crockett and wife conveyed to Harvey Walker and William A. Dillion "a certain tract or piece of land, being his interest in the lands of John Crockett, deceased, which land lies on the waters of Laurel creek in Abbs Valley in Tazewell county, and containing 139 acres, more or less;" and that in the partition of the lands of John Crockett, George Crockett was assigned two tracts of land, one containing thirty-five acres, more or less, lying on Laurel Fork of Bluestone river in Tazewell county, described in a survey made by Kiah Harmon, which was granted to John Crockett by the Commonwealth December 2, 1854, and another tract containing seventy acres, lying in Tazewell county on Laurel creek, "cut off the west end of a 209-acre tract," which was granted to John Crockett by the Commonwealth in September, 1849. While in the deed from George Crockett and wife to Walker and Dillion it is stated that the tracts conveyed contained 139 acres, as a matter of fact, George Crockett seems to have inherited from his father only 105 acres, in separate tracts, as stated above.

On September 2, 1887, Harvey Walker conveyed his undivided one-half interest in these two tracts to Southwest Virginia Improvement Company, and by mesne conveyances Walker's undivided one-half interest passed to, and is now owned by Pocahontas Coal and Coke Company, who in turn leased certain mineral rights therein to Pocahontas Fuel Company. Title to this undivided one-half interest is not in dispute.

Complainants derive their title, if any they have, through William A. Dillion, under and by virtue of the deed of February 27, 1869, from George F. Crockett and wife to Walker and Dillion. In 1910 there was found in the clerk's office of Tazewell county, in the file of unrecorded deeds, a deed dated January 30, 1871, wherein William A. Dillion conveyed to Hiram Christian his undivided one-half interest in these two tracts. On this deed, in the handwriting of the then clerk, is the following notation: "Acknd. in office January 30, 1871," but the formal ac-

knowledgment was not written out, nor was any attempt made in 1910 to have the deed recorded.

On March 23, 1918, John M. Smith and wife leased to Pocahontas Fuel Company, for a period of one hundred years, the exclusive right to mine coal and manufacture coke on the undivided one-half interest claimed by him in these two tracts of land, and on the same day conveyed to Pocahontas Coal and Coke Company all of his undivided one-half interest, subject to the above lease, reserving the right to collect the royalties therefrom.

Appellants contend that William A. Dillion conveyed his interest in the above land to Hiram Christian, and that Hiram Christian, in turn, sold and conveyed the interest so acquired to John M. Smith, but no such deed is produced in evidence. In other words, there are two links missing in appellants' chain of title.

The trial court held that there was no evidence of delivery of the deed from William A. Dillion to Hiram Christian, which ruling constitutes the first assignment of error.

Appellants admit that there is no direct evidence showing delivery, but contend that the following facts and circumstances establish the grantor's intent to deliver: (1) The deed itself and where found; (2) that John M. Smith, by homestead deed dated July 13, 1875, asserted a claim to this land; (3) the record in the suit of *John Graham, Jr.,* v. *F. P. Floyd's Adm'r, etc.,* shows that Dillion had sold his interest to Christian and the latter to John M. Smith; (4) after 1873 no taxes were assessed against Dillion, but were assessed against John M. Smith and his alienees; (5) possession of the lands by those claiming under the deed from Dillion to Christian; (6) affidavits of Hiram Christian and John M. Smith. Taking up these matters in the order named, we find:

 (1) The deed from Dillion to Christian, so far as it is complete, is regular, but the jurat of the officer taking the acknowledgment is not complete, and a simple memorandum, "Acknd. in office January 30, 1871," is not a com-

pliance with the due formality required. There is nothing to show that the deed was left in the office for recordation or delivery to the grantee except the fact that in 1910, thirty-nine years after its date, it was found in the file of unrecorded deeds in the clerk's office. The fact that the clerk of the county is the proper person with whom to leave deeds for the purpose of recordation creates, perhaps, a stronger suspicion that this is what the parties intended to do when the deed was filed with him than if delivered to some other third party, but there must be some evidence tending to show that the grantor intended to part with dominion over the instrument before there can be any delivery. The only thing to be said about this evidence is, that an incomplete deed was found in the clerk's office, which falls far short of proving delivery.

(2) In 1875 John M. Smith claimed the benefit of a homestead exemption to a one-third interest in four tracts of land situated in Abbs Valley on Laurel Ridge, containing 965 acres, "Also * * * all his right, title and interest in and to two tracts of land on Laurel creek, in Tazewell county, containing 116 acres, and a thirty-acre tract in Abbs Valley, in said county, known as the Crockett land, the interest of said John M. Smith in said lands being one undivided half owned jointly by Harvey Walker and Hiram Christian."

From this description in the deed executed by a third party, the court, without further evidence except the land books, is asked to find that the land John M. Smith therein claimed is the same land that George F. Crockett conveyed to Walker and Dillion. Did the scrivener of this deed refer to the thirty-acre tract when he used the language, "known as the Crockett land," or did he intend to say that both the 116 and the thirty-acre tracts were parts of the Crockett land? What interest did Smith claim in this land? In other words, what is meant by, the "interest of John M. Smith in said lands being one undivided half owned jointly by Harvey Walker and Hiram Christian?"

■ John Crockett owned several hundred acres in this section of Tazewell county. There is nothing in the description in the homestead deed from which it could be inferred that this land is the same as the land conveyed to Walker and Dillion. There is no deed, or evidence of a deed, whereby Hiram Christian conveyed a one-half interest in the land to John M. Smith, no witnesses testified that the land in which John M. Smith claimed a homestead was the same land which it is claimed was conveyed by Dillion to Christian, nor do the number of acres mentioned in the two instruments correspond. This deed cannot be considered evidence tending to prove that William A. Dillion delivered to Hiram Christian the deed dated January 30, 1871.

■ (3) The papers in the suit of *John M. Graham, Jr.,* v. *F. P. Floyd's Adm'r, etc.,* seem to have been lost, but from the decrees and abstracts, made by two reputable attorneys, of the papers filed in the suit, it appears that Graham alleged in his bill that he had contracted to purchase from F. P. Floyd a certain tract of land situated in Tazewell county, Virginia, containing, by estimate, seventy-eight acres, more or less, adjoining the lands of Jonathan Smith and others, J. A. Arnold and others, and described as follows: "Being one of a twenty-seven-acre tract adjoining Smith and others and half of eighty acres adjoining Crockett and others, and twenty-five acres from J. A. Crockett," and that F. P. Floyd had died before conveying the property to him.

It was alleged that title to the land was outstanding in Harvey Walker, Hiram Christian and William A. Dillion, who were made parties to the suit—Christian by order of publication. The bill was taken *pro confesso* as to them, and, pursuant to decree, a commissioner conveyed the land described in the bill to Joseph I. Doran, assignee of Graham. Appellants contend that the twenty-seven-acre tract therein mentioned is the same as the thirty-five-acre tract here in question. Graham claimed a fee in the twenty-seven acres, and if the two tracts were identical it

was necessary, in order to support that contention, to allege and prove that Harvey Walker had sold his interest therein, which does not seem to have been done. This is inconsistent with appellants' claim here that they acquired a one-half undivided interest in the same tract through Walker's conveyance to Southwest Virginia Improvement Company.

It was also stated that George F. Crockett owned an interest in the twenty-seven acres, although the deed from him to Walker and Dillion was then of record. It was further alleged that legal title to the eighty acres was in Walker and Dillion and that they had jointly sold this tract to Floyd and John M. Smith. This likewise negatives appellants' present contention. It also appears that Graham claimed the acreage he had contracted to buy constitutes one specific tract made up of three small parcels, while it is established in this cause that the two tracts in question are separate and non-contiguous. Neither the number of acres nor the description of the land mentioned in the two suits corresponds, and the land in the Graham-Floyd suit is not sufficiently identified for us to conclude that the tracts therein mentioned are the same as the two tracts here in question, certainly not sufficient for us to hold that the record in that suit, as presented to us, shows or tends to show delivery of the deed from Dillion to Christian.

■ (4) Appellants filed two exhibits, "Exhibit Land Assessment" and "Exhibit Land Book Charges." These exhibits show that from 1858 to 1867, inclusive, John Crockett, or his estate, was charged with five tracts of land in Abbs Valley on Laurel creek and ridge; there is in evidence a deed dated February 3, 1871, from George F. Crockett, conveying to Hiram Christian a tract of land said to contain forty-five acres. The land books of 1872 show the following assessment: "Hiram Christian, No. qty. Fee Abbs Valley Int. in land Jno. Crockett, dec'd. (By deed George F. Crockett.)" The following year John M. Smith and James C. Smith were assessed with three

large tracts of land and a fourth containing thirty acres, in Abbs Valley, called the Crockett land, and opposite the` assessment is the following notation: "Fee, Abbs Valley, Crockett land (deed gift Jonathan Smith)." In 1874 John M. Smith and James C. Smith were assessed jointly with four tracts totalling 965 acres, and John M. Smith, alone, with three tracts, one containing 832 acres, one thirty acres, and another 116 acres. On the land book is the following notation to the 116-acre assessment: "ac Fee, Laurel creek, H. Christian land." The land books from 1881 to 1885 are missing. From 1887 to 1909 John M. Smith is assessed with fifteen acres and fifty-eight acres on Laurel creek, and opposite these assessments on some of the land books is the notation, "H. Christian land." The number of acres charged on the land books to the different parties does not correspond to the number of acres in the tracts here in question, and the notation on the land books by the assessor is too indefinite to be of probative value tending to show delivery of the Walker deed to Christian.

(5) The tracts of land in question seem to have been wild, wooded mountain lands, which from 1871 to 1908 were unoccupied. Entry and possession thereafter is no evidence that delivery was made of a deed some thirty-eight years prior thereto.

(6) Appellants introduced in evidence, over the objection of appellees, two affidavits, one signed by Hiram Christian, dated April 14, 1917, and the other by John M. Smith, dated April 23, 1921. Hiram Christian died before institution of the suit. John M. Smith was a party thereto. The bill of complaint was filed in April, 1927. The taking of depositions for respondents was begun March 7, 1929. During the taking of the evidence, it was stated by C. B. Smith, son of John M. Smith, that some three years before his father had suffered a partial stroke of paralysis and "he has been up and down ever since. At times his mind is fairly clear and at other times it wanders," and that at that time (March, 1929) he did not think his father was in physical or mental condition to testify. There-

upon witness verified the signature of his father to the affidavit.

This áffidavit, which is in narrative form, states that John M. Smith bought the lands in question from Hiram Christian, to whom he paid the purchase price, and who at the time gave him a deed to the property, which deed. was filed with the clerk of Tazewell county for recordation, but it was never recorded and had been lost; that he and those to whom he had sold and conveyed the property had been in possession and had paid all taxes on the land since 1871. These statements were made more than three years after John M. Smith had leased the coal-mining rights to Pocahontas Fuel Company and had conveyed to Pocahontas Coal and Coke Company all his right and claim in and to the land, except the right to collect the royalties under the terms of the lease.

The contention is that the self-serving declarations in affidavit form are permissible under the authority of *Honaker Lumber Co.* v. *Kiser,* 134 Va. 50, 113 S. E. 718, 721. In that opinion, delivered by Judge West, it is said:

"In the case of real estate, declarations by one in possession of land are competent to show that his user or possession was adverse to the title of another, to determine the extent of his possession, to indicate the source of the title relied on, so far as that fact may have legitimate incidental bearing on the good faith and nature of the claims, or its extent, to show the intent with which the declarant made an entry on land; it is not ground for rejecting the declaration that it is self-serving. 22 C. J. 274. The following cases are also instructive: *Clary* v. *Hatton,* 152 N. C. 107, 67 S. E. 258; *Hill* v. *Bean,* 150 N. C. 436, 64 S. E. 212; *Steadman* v. *Steadman,* 143 N. C. 345, 55 S. E. 784.

"Declarations of a person in possession of land are primary evidence of the extent of his claim. 22 C. J., p. 275."

There plaintiff, to prove title, relied upon (1) a deed from a former record owner, (2) a court right (whatever that may mean), and (3) adverse possession. Hence the

nature of his possession was a material issue in the case. Speaking to the point, it was said:

"Whenever the fact of possession is relevant to the issues, the declarations accompanying and characterizing the same are competent as part of the *res gestae* of the acts of possession. 11 Ency. Ev. 388."

The theory upon which such declarations are held admissible is stated by some authorities to be that they are a part of the *res gestae*. This is illustrated in the old form of livery of seisin, "in taking in his hand the deed and the ring of the doore (if it be of an house) or a turffe or twiggee (if it be of land), and the feoffee laying his hand on it, the feoffer says to the feoffee, here I deliver to you seisin of this house or of this land." The words are complementary to the manual conduct and are as essential as the conduct to the total complexion and legal significance of the act.

"Again, the occupation of land is, merely as a physical act, capable of various interpretations, and may need to be completed by words, in order to have legal significance. 'What a man says when he does a thing, shows the nature of his act and is a part of the act; it determines its character and effect; tenancy is a continuance of acts in a certain relation to another, and declarations during the tenancy by a man that he is a tenant, and of a particular person, may be put as a part of the *res gestae*,' so far as it is necessary to learn the significance of his act, and assuming that his act of possession is material. * * *

"The words are not used testimonially; for example, where it is asked whether A's possession is adverse, *i e.*, under claim of ownership, his utterance, 'This land' is mine; for I bought it of B,' is not used as evidence that it is his and that he did buy it of B, but merely as giving to his occupation an adverse complexion and significance. The applications of this principle are numerous." Greenleaf on Evidence (16th Ed.), vol. 1, pp. 189, 190.

Both affidavits are narrations of past events. It is not even claimed that at the time Hiram Christian made the

affidavit he was in possession of the land. Indeed, it was made more than forty-six years after it is alleged he had transferred to another all his right, title or interest in the land. In *Garnett* v. *Sam and Phillis,* 5 Munf. (19 Va.) 542, the controversy involved the freedom of slaves. It was there held that in order for an affidavit containing declarations of a former owner to be admissible, it must be made to appear that the declarations were made while the affiant had possession of and claimed the slaves, and that one of the parties to the suit traced title to the declarant. Clearly, the affidavit of Hiram Christian was not admissible.

If we assume that the right retained by John M. Smith to collect the royalties due under the terms of the lease to Pocahontas Fuel Company gives to him such possession as would render his declarations characterizing or explanatory thereof admissible, then the contents of his affidavit are not admissible because they are simply narrative of past occurrences, and were not offered to explain possession, but to prove title.

In *Parkersburg Industrial Co.* v. *Schultz,* 43 W. Va. 470, 27 S. E. 255, it was held that declarations of one in possession of land, explanatory of such possession, as under what right or claim, are admissible to show his claim, but not to show title.

In *Dodge* v. *Freedman's Sav. & Trust Co.,* 93 U. S. 379, 23 L. Ed. 920, it was held that declarations of a person in possession of land are competent evidence, as against those claiming the land under him, to show the character of possession of the person making them, and by what title he holds, but not to sustain or destroy the record title. See 1 R. C. L. 490.

"Where declarations offered in evidence are merely narrative of a past occurrence, they cannot be received as proof of the existence of such occurrence. They must be concomitant with the principal act, and so connected with it as to be regarded as the mere result and consequence of the coexisting motives, in order to form a proper criterion

for directing the judgment which is to be formed upon the whole conduct." Greenleaf on Evidence (16th Ed.), vol. 1, p. 192.

In *Freda* v. *Tischbein,* 174 Mich. 391, 140 N. W. 502, 504, 49 L. R. A. (N. S.) 700, 710, it was said:

"The instances when the declarations should be received are when the character of the possession, or nature of the claim made, becomes material with a view to the determination of some ulterior question; as, for instance, cases in which a right rests upon the statute of limitations, and it is necessary to show that the possession was adverse. To say that, in a case where the only issue is actual ownership, a party may support his title by proof of his own declarations to third persons on sundry occasions, not in the presence of the claimant, is to declare that one may manufacture evidence for himself."

Applying these principles, we find no error in the refusal of the court to admit either of the affidavits in evidence.

As stated above, the Dillion deed to Christian was found in the clerk's office in 1910. In April, 1917, Christian wrote the clerk to deliver the deed to bearer, who was an agent of Pocahontas Coal and Coke Company. On April 23, 1921, the deed was presented to H. S. Surface, the then clerk of the Circuit Court of Tazewell county, with the request that it be recorded. The clerk, upon proof of the signature of William A. Dillion by John M. Smith and John A. Murphy, admitted it to record. Recordation under such circumstances, even if valid, raises no presumption that the deed was ever delivered. If presumptions are to be indulged in, it seems reasonable to conclude that the former clerk would have discharged his duty, and if the deed had been unconditionally delivered to him, either for the purpose of recordation or of delivery to Christian, it would have been recorded or delivered.

Appellants rely upon the case of *Downs* v. *Downs,* 89 W. Va. 155, 108 S. E. 875, but the facts in that case are

different from the facts in this case. There the deed was recorded and the grantee, soon after recordation, entered into possession of the property and remained in possession for fifteen years; after his death the grantor sought to have the deed cancelled on the ground that there had been no delivery. The court held that the evidence did not overcome the presumption of delivery and purchase from the fact of possession and the conduct of the parties following recordation of the deed. Here there had been no attempt at recordation until more than fifty years after the deed was left in the clerk's office, whether conditionally or unconditionally is not shown.

Whether we consider the circumstances relied upon to prove delivery separately or altogether, they are insufficient to show that the grantor, William A. Dillion, intended to part with dominion over or control of the deed to Hiram Christian. Hence, we find no error in the trial court's ruling on this point.

This brings us to the question of adverse possession. It is conceded, or if not conceded clearly established, that there was no actual occupation or possession of either tract of land prior to 1908. In that year Pocahontas Coal and Coke Company suggested by letter to John M. Smith that the parties put a tenant upon the property; Smith was agreeable, and shortly thereafter one J. B. Bowman took possession of the thirty-five-acre tract under a written lease from Pocahontas Coal and Coke Company. Some time in 1909 one Henry Barnett, who was a tenant residing on another tract of land owned by Pocahontas Coal and Coke Company, was given a written lease to the seventy-acre tract, and instructed to clear up at least three acres of land.

The appellees introduced evidence tending to show that possession of the seventy-acre tract was not open, notorious and continuous for the statutory period. A detailed discussion of the evidence would make this opinion needlessly long. Suffice it to say that the evidence on the point abundantly supports the conclusion

of the learned chancellor, who said: "There is a substantial and troublesome conflict in the evidence. * * * On a careful weighing and analysis of all the evidence it seems to me the fair conclusion is that the defendants (appellants) have not sustained the burden that is on them with respect to the possession of this (seventy-acre) tract, and I so sold."

The appellees assign cross-error to the action of the court in holding that the appellants had acquired a complete title to the thirty-five-acre tract by adverse possession. The ground for this cross-error is that Pocahontas Coal and Coke Company was a tenant in common with appellees, and that entry and possession of one will be deemed entry and possession of all until some notorious act of ouster or adversary possession is brought home to the other co-tenant. The contention is that there was no notice, actual or constructive, that the occupation of the land was hostile to appellees. See *Virginia Coal, etc., Co.* v. *Hylton,* 115 Va. 418, 79 S. E. 337, Ann. Cas. 1915A, 741.

Appellees knew that the entry upon the land in 1908 and the continuous occupation of it thereafter were hostile to them and under a claim of right. They knew that John M. Smith had for some time prior thereto claimed an undivided one-half interest. In 1910 they seem to have gone upon the land and informed Bowman that they owned a one-half interest therein. They also engaged and paid an attorney to investigate the matter. The record does not reveal the result of this investigation, and no legal action was begun until some seventeen years thereafter. They knew that Pocahontas Coal and Coke Company denied that the relationship between them was that of co-tenants, and while there is no direct evidence showing that they had actual knowledge of the fact that entry upon and occupation of the land was the joint entry and occupation of John M. Smith and Pocahontas Coal and Coke Company, the inference from all the facts and circumstances clearly leads to that conclusion. The trial

court so found, and we cannot say that this finding was erroneous.

█ The title of William A. Dillion to the lands in question was a matter of record, and notice to all of his ownership therein. Appellants obtained an unacknowledged and unrecorded deed from the clerk's office and on an *ex parte* hearing before the clerk caused it to be spread upon the records. This suit was instituted within the time prescribed by law, for the purpose of removing that deed so recorded and others which created clouds upon complainants' title derived by descent cast from William A. Dillion. Under such circumstances, the lapse of no period of time short of that prescribed by the statute of limitations will bar the right to maintain the suit, hence the doctrine of laches has no application.

Upon the whole case we find no error and the decree is affirmed.

*Affirmed.*